**SO ORDERED.**

**SIGNED this 18 day of July, 2013.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:                                                                    CASE NO.

JOHN WAYNE PROCTOR,                                       12-08116-8-SWH

      DEBTOR

## MEMORANDUM OPINION REGARDING CONFIRMATION OF PLAN

On July 1, 2013, in an order confirming the debtor's modified chapter 11 plan and overruling objections by creditor OneWest Bank, FSB ("OneWest") and the bankruptcy administrator, the court indicated that the bases for those rulings would be set out in a forthcoming memorandum opinion.

The determinative issue for confirmation purposes was whether the debtor was precluded from modifying his debt to OneWest. The debt is secured by real property that the debtor originally purchased for use as a second home, but at the time of filing the petition used and continues to use as his principal residence. For the reasons set forth below, the court concludes that whether the real property constitutes the debtor's "principal residence" for purposes of § 1123(b)(5) is best determined with reference to the loan documents that gave rise to the security interest, rather than by the status of the property as the debtor's principal residence on the date of the petition. That analysis, on the facts of this case, supports the debtor's effort to modify the debt.

**BACKGROUND and STATEMENT OF THE ISSUE**

The debtor filed a petition under chapter 11 on November 13, 2012. The debtor's original plan of reorganization was filed on February 11, 2013, followed by a modified plan on May 3, 2013. In his plan, the debtor sought to modify a loan secured by real property located at 1857 Torrington Street, Raleigh, North Carolina (the "Raleigh property" or "property").

The debtor acquired the Raleigh property in 2006, and it is uncontested that the debtor purchased that property specifically for use as a second home. The loan documents provide, in the "Occupancy" provision of an addendum entitled "Second Home Rider" (which is incorporated into the security instrument), that the debtor "shall occupy, and only use, the Property as Borrower's second home." Debtor's Supplement to Memorandum of Law in Support of Modified Plan of Reorganization, Ex. A (Docket # 67). The Second Home Rider states further that the second home occupancy provision *replaces* the otherwise standard provision in the loan documents, which requires a borrower to "occupy, establish, and use the Property as Borrower's principal residence." Id.

At the time the debtor purchased the Raleigh property, his principal residence was located in Wappinger Falls, New York. The debtor relocated from New York to North Carolina in 2009 and began, at that time, to reside full-time at the Raleigh property, which he continues to do today. The debtor still owns his former principal residence in Wappinger Falls, but he will surrender that property in the chapter 11 case. There is no suggestion of bad faith or system manipulation with regard to the timing of the debtor's move from New York to North Carolina, or in his use of the property.

**DISCUSSION**

The anti-modification statute prohibits modification of "a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1123(b)(5); see also § 1322(b)(2) (providing that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence"). In more routine situations, when debtors seek to avoid foreclosure on a principal residence in chapter 13 or individual chapter 11 cases, the facts typically tend to show that the property was purchased for use as a principal residence and was in fact used for that intended purpose, through the date on which the petition was filed. In those scenarios, the real property "is the debtor's principal residence" as of the mortgage date and the petition date, so the specific temporal issue before the court today does not arise.[1]

That temporal question is front and center in this case: In determining whether real property is a debtor's "principal residence" within the meaning of § 1123(b)(5), does the court look to whether the property was the debtor's principal residence at the time of the mortgage transaction, or to the time the petition was filed? An excellent overview set out by the bankruptcy court for the Northern District of New York[2] captures both the question, and its far-reaching implications:

---

[1] Of course, the anti-modification statutes provide plenty of alternative opportunities for conflicting interpretations with regard to, for example, the seemingly plain "secured only by" and "real property" language. A creditor's security interest in real property upon which a debtor resides principally in a mobile home (which under applicable state law may be considered personal property), or also operates a business (such that the debt is not secured "only" by a principal residence), or rents living space to a third party (same), can provide a court with hours of thought-provoking conundrums. See, e.g., In re Moore, 441 B.R. 732 (Bankr. N.D.N.Y. 2010) (collecting and discussing cases).

[2] In that case, In re Moore, 441 B.R. 732, 740 (Bankr. N.D.N.Y. 2010), the court was discussing § 1322(b)(2), not § 1123(b)(5). However, the two provisions are substantively identical. As the Bankruptcy Appellate Panel for the Ninth Circuit pointed out in its comprehensive discussion

> The importance of § 1322(b)(2) and, by extension, the Court's application of the same, cannot be overstated. "It is through this provision that chapter 13 relief achieves great efficacy and substance. The debtor's ability to modify the terms of prepetition debts that have become too onerous to satisfy, as originally contracted, is an invaluable feature of debt adjustment under chapter 13." Miles, supra, at 217. Yet, Congress saw fit to afford special protection to lenders holding mortgages against only the debtor's home by prohibiting bifurcation of their claims under § 506(a), thereby causing litigants and jurists to struggle with the questions of why and to what extent.
>
> So much has been written about the scope of § 1322(b)(2) and what is meant by the language "other than a claim that is secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2) (2010). Courts have widely disagreed over the proper application of the anti-modification provision, yet each one proclaims that its rule best comports with the "plain meaning," the legislative history, congressional intent, and/or the fundamental principles of bankruptcy law that mandate striking a balance between equity and fairness for the creditor and a "fresh start" for the debtor. See Miles, supra, at 207-08. These standards and their underpinnings need not be restated at length here. Rather, it is enough for this Court to set forth the competing and now well-known rules and, as it must, choose a side in the continuing debate so that it may apply its settled rule to the facts at hand.

In re Moore, 441 B.R. 732, 740 (Bankr. N.D.N.Y. 2010) (footnote omitted), quoting Veryl Victoria Miles, The Bifurcation of Undersecured Residential Mortgages Under § 1322(b)(2) of the Bankruptcy Code: The Final Resolution, 67 Am. Bankr. L.J. 207 (1993)).

The temporal issue has yet to reach the Court of Appeals for the Fourth Circuit. It recently arose in this district, but was not decided on grounds that resolution was not crucial to confirmation, because under either interpretation, the debtor's residence was the same. See In re McCowan, Case No. 09-10347-8-JRL (Bankr. E.D.N.C. June 21, 2010). In the instant case, however, the question is dispositive. If the debtor's "principal residence" is determined with reference to the loan

---

of the matter, an analysis of either one of the statutes has equal value when applied to the other. Benafel v. One West Bank, FSB (In re Benafel), 461 B.R. 581, 585 (B.A.P. 9th Cir. 2011).

documents, the loan may be modified and the case confirmed; if it is determined with reference to the petition date, then the debt cannot be modified and the plan, as drafted, fails.

**I.     Parties' Positions**

The debtor points to multiple factors in support of his position that the loan documents should control whether the property is, for purposes of the anti-modification statute, considered his principal residence. He notes that at the time of purchase, the property was "clearly *not*" his principal residence, given that he "lived and worked in New York; the interest rate of 7.125% on the Torrington Street property, while typical for a vacation or second home, would have been highly unusual for a principle residence; and, most convincingly, the lender attached to the deed of trust a "Second Home Rider" specifically stating that "borrower shall occupy ... the Property as Borrower's second home." Debtor's Memorandum at 2. In the debtor's view, the "focus of § 1123(b)(5) is on the security instrument, itself: a static document with four rigid corners capable of being properly deduced and analyzed. It is not the fluid, subjective, often uncertain facts of a debtor's principle residence that govern the anti-modification statute, but the specific reality of the debtor that is expressed by the parties in the security agreement." Id. at 5.

On the other hand, as the debtor readily acknowledges, it is "[e]qually clear" that he "currently considers the property his principle residence, considered it his principle residence at the time his bankruptcy case was filed, and has every present intention of maintaining the home as his principle residence in the future." Id. at 3. In its original objection to confirmation, OneWest asserted simply that the sums due to it were secured by a deed of trust, which was properly filed, and grants a security interest in real property that "is the Debtor's primary residence." OneWest's Objection to Confirmation at ¶ 5. OneWest also argued at the hearing that the debtor's use of the

property as his principal residence at the time he filed the petition is consistent with usage of the word "is" in the statute. In other words, temporally speaking, the debtor agreed that the property "is" his principal residence as of the petition date, which is the date at which the parties' relative rights in bankruptcy are fixed. That, One West concludes, precludes modification of the debt.

## II.     The "Petition Date Controls" Analysis

At present, the leading decision in support of focusing on the petition date is In re Abdelgadir, 455 B.R. 896 (B.A.P. 9th Cir. 2011). In Abdelgadir, the bankruptcy court confirmed the debtors' chapter 11 plan and allowed modification of a claim secured by real property that the debtors considered their principal residence as of the *petition* date, but not as of the *confirmation* date. Focusing on this latter date, and noting that the debtors no longer lived in the residence at the time of the confirmation hearing, the bankruptcy court concluded that the lender's claim was not secured by real property that "*is* the debtor's principal residence." Id. at 902. On appeal, the lender argued that "the character of property must be determined at the time the creditor takes a security interest in the collateral" or, alternatively, as of the petition date. Id. at 899. The bankruptcy appellate panel reversed and held that the petition date controls, not the loan transaction date or the confirmation date.

The Abdelgadir court examined the statutory language of not only § 1123(b)(5), but also of other provisions it considered equally important: the statutory provisions defining a "claim." Id. at 900-01. "Based on the grammatical structure of the statute," the court wrote, "the words 'secured only by a security interest in real property that is the debtor's principal residence' modifies 'claim' and describes the type of claim that is excepted from modification." Id. at 903. A creditor's "right to payment," the court reasoned,

> whether it later is deemed secured or unsecured depending on the value of the collateral, is fixed at the petition date. 11 U.S.C. §§101(5); 502; In re Dean, 319 B.R. at 478. Therefore, our statutory analysis leads us to conclude that the determinative date for whether a claim is secured by a debtor's principal residence is, like all claims, fixed at the petition date.

Id. Although Abdelgadir was a chapter 11 case, the Ninth Circuit BAP subsequently reasoned that the same analysis applied equally to chapter 13 cases as well. Benafel v. One West Bank, FSB (In re Benafel), 461 B.R. 581 (B.A.P. 9th Cir. 2011).[3]

In Benafel, the facts aligned somewhat more closely with the facts of the instant case in that the issue did "not involve whether [the debtor] used the Property as something other than her principal residence, but rather, the relevant date to be used by the bankruptcy court in asking that question." Id. at 591 n.9. The Benafel court undertook an updated review of the split in authority on whether the petition date or transaction date controlled, and pointed out that even the direction of the "trend" in interpreting the statutes is in dispute. Id. at 589. "Regardless of recent 'trends,'" the court concluded, "we find that the majority of the cases interpreting § 1322(b)(2) favor use of the petition date to determine principal residence." Id.; citing In re Christopherson, 446 B.R. 831, 835 (Bankr. N.D. Ohio 2011) (critical date is petition filing date because "minority [transaction date] position requires a subjective look into the parties' intentions which is difficult to ascertain after the fact"); see also, e.g., In re Austin, 2012 WL 1372212 *1 (Bankr. S.D. Ill. 2012) (noting "strong split of authority" and concluding that the petition date is the "more appropriate" choice, given that it is "the crucial moment in many respects in bankruptcy"); In re Kendle, 2012 WL 5723088 *1 (Bankr.

---

[3] Notably, OneWest, the creditor in this case, also was the creditor in Benafel. In that case, OneWest took the position that the loan documents *should* control; the opposite of its position in this case. Benafel, 461 B.R. at 591 ("It may be ironic in the current appeal, where One West argues in favor of using the loan transaction date, that some cases aligning with One West's position did not result in a desirable outcome for the secured creditor.").

S.D. Fla. 2012) (disagreeing with other precedent within the Southern District of Florida, and concluding: "Regardless of where the Debtor currently resides, the determination of "principal residence" for purposes of the anti-modification provision of 11 U.S.C. §1123(b)(5) must be made as of the petition date.").

### III. The "Mortgage Documents Control" Analysis

Other courts, with an identical focus on the statutory language, reach the opposite conclusion. In In re Scarborough, 461 F.3d 406, 412 (3rd Cir. 2006), the Third Circuit considered a creditor's security interest in a multi-family dwelling, with respect to which the lender took its security interest knowing that the property was acquired in part as an investment and that the borrower would lease a portion of the real property to a third party. Interpreting § 1322(b)(2) (§ 1123(b)(5)'s substantive twin), the court examined the loan documents to determine whether the creditor's claim was secured by "*any* real property that is not the debtor's principal residence." Id. at 411. The creditor argued that this approach encouraged bad faith, in that a debtor could avoid the anti-modification exception by, for example, adding a second living unit to the secured property. The court was not persuaded, and instead emphasized what it viewed as a fundamental aspect of the exception:

> for purposes of § 1322(b)(2), the critical moment is when the creditor takes a security interest in the collateral. "It is at that point in time that the underwriting decision is made and it therefore at that point in time that the lender must know whether the loan it is making may be subject to modification in a Chapter 13 proceeding at some later date."

Id. at 412, quoting In re Bulson, 327 B.R. 830, 846 (Bankr. W.D. Mich. 2005). The Scarborough court reasoned that the bank "cannot, and does not, claim surprise," and that there simply was "no

8

question in the instant case that the Mortgage and Family Rider granted Chase Manhattan an interest in real property that was not the debtor's residence." Id.

In addition, when it analyzed the statute's structure, the court concluded that "[b]y using the word 'is' in the phrase 'real property that is the debtor's principal residence,' Congress equated the terms 'real property' and 'principal residence.' Put differently, this use of 'is' means that the real property that secures the mortgage must *be only* the debtor's principal residence in order for the anti-modification provision to apply." Id. at 411. Determining the nature of real property, the court reasoned, and the nature of a creditor's interest in it, requires reference to the precise moment that the security interest is given:

> Just as a creditor who takes *any* interest in personal property forfeits the benefit of § 1322(b)(2), so does a creditor whose claim is secured by *any* real property that is not the debtor's principal residence. If a mortgage includes language that "is effective to grant an interest in such collateral, the mortgagee is at its peril in not deleting it."

Id. at 411-12, quoting In re Ferandos, 402 F.3d 147, 155 (3rd Cir. 2005).

Other courts adopt similar reasoning. In Moore, the mixed-use property case discussed above, the court summarized the issue as follows:

> Thus, in the case of principal residence disputes under § 1322(b)(2), the decisive factors are solely "(1) whether the claim is secured only by real property, and (2) whether the real property is the debtor's principal residence." Scarborough, 461 F.3d at 411. In answering these questions, the relevant time period is necessarily when the creditor takes a security interest in the real property in question, and the Court must, therefore, "look to the character of the collateral at the time of the mortgage transaction." Id. at 412.

Moore, 441 B.R. at 739-41; see also In re Galaske, 2011 WL 5598356 *2 (Bankr. D. Vermont 2011) ("If the real property is not being used solely as the debtor's principal residence at the time of the mortgage transaction, the anti-modification provision of § 1322(b)(2) is inapplicable."), rev'd on

9

other grounds, JPMorgan Chase Bank, NA v. Galaske, 476 B.R. 405 (D. Vermont 2012); In re Zaldivar, 441 B.R. 389 (Bankr. S.D. Fla. 2011) ("character of the transaction" and substance of what the lender bargained for are paramount); cf. In re Santiago, 404 B.R. 564 (Bankr. S.D. Fla. 2009) (because Eleventh Circuit had not decided the issue, court applied both approaches, but did not specifically adopt one or the other because either way, creditor lost; court concluded that debtor would prevail under mortgage document approach because mortgage was specifically for second home, and that creditor could not meet burden of proof to establish that property was debtor's principal residence as of petition date).

In Zaldivar, out of the Southern District of Florida, the bankruptcy court considered facts similar to those in the instant case in that a "1-4 Family Rider" addendum attached to the debtor's mortgage documents specifically deleted the requirement that the borrower use the property as her principal residence. As in Scarborough, the issue in that case was whether the property was used "only" as the debtor's principal residence, given that the real property was a duplex of which half served as the debtor's principal residence, and the other half was rented to a third party. "Because a loan is priced according to the risk of the transaction," the court wrote, "it makes a good deal of sense to look at the substance of the bargain between the parties to determine whether strip-down is prohibited by § 1322(b)(2)." Zaldivar, 441 B.R. at 390. Reasoning that the "entire point" of the anti-modification provision is to "'encourage the flow of capital into the home lending market' by reducing risk to mortgagees," the court concluded that the "predominant character of the transaction governs whether the anti-modification provision applies." Id. at 390-91, quoting Nobelman v. American Savings Bank, 508 U.S. 324, 332 (1993) (concurring opinion of Stevens, J.).

10

**IV.     Application of "Mortgage Documents Control" Analysis**

Having fully considered both approaches, this court will determine the debtor's principal residence for purposes of § 1123(b)(5) with reference to the mortgage documents, not the petition date. Because the Court of Appeals for the Fourth Circuit has not yet addressed the exact issue before this court, there is no controlling precedent. Instead, this court's conclusion rests upon the thoughtful and useful discussions set out by proponents of both views, above, and also on the fact that courts within this circuit frequently reach decisions in related "determination of principal residence" contexts by turning first to the loan documents. That focus on what the parties originally bargained for, and what those parties understood their rights to be, strikes this court as the most appropriate starting point when a debtor's principal place of residence is in dispute.

Here, it is undisputed that the debtor's loan was expressly conditioned upon the property being used as a second home, and the interest rate charged by OneWest (or, more accurately, OneWest's predecessor- in-interest, though the distinction is irrelevant for present purposes) reflects this. OneWest, as lender, acknowledged its higher risk factor *and was compensated for it* on terms established by OneWest. Without delving into the statute's legislative history and related considerations of congressional intent, the court points out the obvious, which is that a lender's expectations in extending a loan are best captured by the language of loan documents that, invariably, the lender itself provided. See Nobelman, 508 U.S. at 332 (concurring opinion of Stevens, J.).

OneWest had no reasonable expectation that its loan, which secured real property explicitly identified as a secondary and *not* principal residence, could come within the protection of the anti-modification statute. Thus, to the extent that the anti-modification provision was intended to

11

encourage lenders to extend loans with a clear understanding of whether such a loan could potentially be modified based upon a borrower's changed financial circumstances, using the expectations articulated in writing in the loan documents does that far more effectively than an assessment at any later time. It also precludes efforts by debtors who maintain multiple residences to manipulate "principal residence" status by moving from one property to another prior to filing a petition, in order to essentially select which of multiple mortgages will *not* be eligible to strip down – and, by extension, which mortgages are.

As noted above, other "principal residence" decisions in this circuit also tend to look to the loan documents, doing so matter-of-factly and without much discussion, almost as a matter of course. In In re Ennis, 558 F.3d 343 (4th Cir. 2009), for example, the court of appeals held that changes to the § 101(13A) statutory definition of a principal residence (to include a mobile home that is not attached to real property) did not, itself, imply any change to the already existing and entirely separate requirement in § 1322(b) that a claim be secured only by "real property that is the debtor's principal residence." To resolve the issue of whether the debtor's mobile home was real property under the new BAPCPA definition of "principal residence" or personal property, as the debtor argued, the court looked to state (Virginia) law to determine how the mobile home was taxed, and examined the security agreement itself. In the agreement, the debtor "agreed that the mobile home would 'remain personal property' and that it would 'not become a fixture or part of the real property' without Green Tree's written consent." The court concluded that the mobile home constituted personal property, and that the mortgage could be modified. Ennis, 558 F.3d at 346; see also In re Hughes, 333 B.R. 360, 362 (Bankr. M.D.N.C. 2005) (in a multi-faceted use of primary residence case, the court held that whether a creditor's claim was secured "solely by the security

interest in the Debtor's residence within the meaning of section 1322(b)(2) is a determination which should be made by examining the GMAC loan documents.").

The Ennis court did not delve into legislative history, but it did rely on an earlier Fourth Circuit case, In re Witt, 113 F.3d 508 (4th Cir. 1997), which did. In Witt, the court held that 11 U.S.C. § 1322(c)(2) "precluded bifurcation of an undersecured loan into secured and unsecured claims if the only security for the loan is a lien on the debtor's principal residence." Id. at 513-14. The court acknowledged that the effect of the court's decision would be to require the debtors to pay back the full amount of their mortgage loan, which was facially contrary to bankruptcy's "fresh start" goals. However, as the court pointed out, other factors are relevant:

> As Justice Stevens recognized in Nobleman, "[a]t first blush it seems somewhat strange that the Bankruptcy Code should provide less protection to an individual's interest in retaining possession of his or her home than of other assets." Nobelman, 508 U.S. at 332 (Stevens, J., concurring). Permitting bifurcation of home mortgage loans, however, could make lenders more hesitant to make such loans in the first place. Although a broader reading of § 1322(c)(2) might help the Witts today, it could make it more difficult in the future for those similarly situated to the Witts to obtain any financing at all. Congress appears to have designed another important section, § 1322(b)(2), *with this result in mind*. See id. (stating that § 1322(b)(2)'s "legislative history indicat[es] that favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market").

Id. at 514 (emphasis added); see also Zaldivar, 441 B.R. 389, 390-91 (collecting and discussing cases).

In this particular matter, the debtor prevails. However, the court's holding could just as easily benefit a lender seeking to avoid modification of a loan expressly made for real property to be used as a principal residence, then subsequently put by the debtor to a different or additional purpose. See, e.g., Benafel, 461 B.R. at 591. In different factual circumstances, the mortgage document analysis could work real hardship on debtors' expectations in bankruptcy, given that

individual circumstances *change*, for a host of reasons, often in connection with employment, health, marital status or family size. Those changes, in turn, prompt natural changes in domicile. In contrast, a lending bank's expectations are comparatively stable and written in ink. The two are destined to clash and when that happens, in the court's view, the determination of principal residence for purposes of § 1123(b)(2) should be made with reference to that specific point in time in which debtor and lender *were* in full agreement as to their expectations, and articulated them in the mortgage documents .

## CONCLUSION

For the foregoing reasons, the objections of One West and the bankruptcy administrator to the debtor's plan were **OVERRULED**, and the debtor's modified chapter 11 plan was confirmed on July 1, 2013.

**SO ORDERED**.

### END OF DOCUMENT